FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 SEP -7 PM 1: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| WANDA KENT WARD, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | |
| | } | 98-AR-1125-S |
| TOYS "R" US, INC., | } | |
| | } | |
| Defendant. | } | |
| | } | |

ENTERED

SEP - 7 1999

**MEMORANDUM OPINION**

Presently before the court is a motion for summary judgment filed by defendant, Toys "R" Us, Inc., ("TRU"). TRU seeks judgment as a matter of law on all claims asserted against it by its former employee, Wanda Kent Ward ("Ward"). Specifically, TRU seeks summary judgment on Ward's claim that it discriminated against her with regard to her pay and promotion on account of her sex, female, and that it sexually harassed her and retaliated against her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Additionally, Ward claims wage discrimination in violation of the Equal Pay Act of 1963 ("EPA"). Last, Ward makes state law claims of negligent hiring, supervision and retention. For the reasons hereinafter stated, TRU's motion is due to be GRANTED in part and DENIED in part.

## GENERAL ALLEGATIONS OF DISPARATE TREATMENT

After 17 years as an assistant manager of a Handy Dan Hardware Store, Ward applied for a management trainee position at TRU, and was hired for that position on April 29, 1991. She sought an annual salary of $25,000.00, but was told that this figure was high for the management trainee position, and she accepted TRU's offer of $22,000.00. Ward has submitted evidence that some male management trainees were hired during the same time period at higher base salaries that also included guaranteed bonuses.

Between August, 1991 and February, 1995, Ward rotated as a manager among the three areas of responsibility in TRU's Hoover Store: storeroom, front end, and sales floor. During this period, she was supervised by four Assistant Store Directors - Amy Rosenberg, Lee Glasscock, Rick Mayo and Kim Dale - and three Store Directors - Eric Pohl, David Jones, and Pam Johnson. During this three-and-one-half-year period, Ward received positive written evaluations and annual raises.

Throughout this time between 1991 and 1995, Ward regularly expressed her interest in promotion. She was told that in order to be considered for promotion, she would need to complete TRU's Technical Proficiency Status forms. Certain male candidates were promoted ahead of Ward during this time without having been required to complete these forms. These male candidates were among the "fast-trackers." "Fast-trackers" were candidates with various

2

types of management experience from outside TRU who were recruited for management positions, paid at a higher rate, frequently given guaranteed bonuses, and promoted into higher management positions more quickly. During the period of Ward's employment and for some time before, virtually all "fast-trackers" at TRU were male.

On February 19, 1995, after three and one half years with TRU, Ward was promoted to the position of Assistant Store Director at the Eastwood Mall store. Upon being promoted, Ward received a raise of $2,200.00, bringing her annual salary to $29,900.00, with management incentive bonuses increased to up to 15% of her salary.

Ward performed well as Assistant Store Director and developed a good working relationship with Doug Bell ("Bell"), the Store Director. During that time Bell discovered that some male floor managers at Eastwood were paid almost as much as Ward in her position as Assistant Store Director, and Bell urged the District Manager, Craig Fitch ("Fitch") to give Ward a raise. Bell obtained Ward a raise of $2,000.00.

When Bell was promoted to a Store Directorship at a larger store, he told Ward that he was recommending her for the position of Store Director at the Eastwood Mall store to replace him and that he felt that she was the top candidate. Notwithstanding Bell's written recommendation, Ward was passed over for the promotion and a manager from outside named Gary Yazer ("Yazer") was brought to the Eastwood store by Fitch, who introduced Yazer to

3

everyone as the new Store Director.   After a background check
turned up  problems with Yazer's application, Fitch called Ward to
tell her that she would get the promotion after all, stating
"you have what you want, for now."

On March 10, 1996, Ward was promoted to Store Director of the
Eastwood Mall store.  One of the managers of the Eastwood store,
Charles Mitchell, ("Mitchell") was promoted to Assistant Store
Director.  Upon being promoted to Store Director, Ward received a
salary increase in the amount of $3,500.00, with potential bonuses
increased to up to 20% of salary.  Within three weeks of that time,
on March 31, 1996, the Eastwood store, based on its history of
increased sales, was reclassified to a higher level "B" store in
the hierarchy of TRU stores.  This reclassification brought Ward an
additional  pay  increase  of  $5,200.00,  bringing  her  total
compensation to $44,700.00, plus bonus.  Thus, within a thirteen
month period, Ward's salary increased a total of $17,000.00, from
$27,700.00 to $44,700.00.

These  salary  increases,  however,  while  substantial,  only
brought Ward up to, or just over, the minimum pay level for each
successively higher position.   What records there are for male
management personnel at TRU indicate that no male was paid at the
mere minimum level for any corresponding position.

Shortly after Ward took over as Store Director, TRU instituted
a new policy referred to as "Islands of Service."  The parties  in

4

this case agree that shortly after this new policy was implemented, complaints were lodged against Ward in her capacity as Store Director. The parties do not agree, however, on the cause of these complaints.

Ward maintains that the complaints were based on the problems resulting from the implementation of the Islands of Service program. She says that she discussed with Fitch in advance the likelihood of dissatisfaction among the employees with this new policy. Ward's predictions were based on the fact that the new store policy would involve dramatic changes in employee assignments and working hours. Ward further maintains that Fitch told her to proceed anyway with implementation, and that he and the company would stand behind her in her relations with the employees.

Ward says that her predictions came true, and that employee morale suffered greatly. Furthermore, she asserts that Fitch did not stand behind her as he promised, but left her stranded to take the blame. In addition, Ward alleges that Mitchell, the Assistant Store Director, deliberately undermined her and encouraged the employees to complain against her so that in the future, he could "get the store."

In contrast, TRU asserts that the complaints against Ward at Eastwood resulted from the fact that Ward was a poor manager. In addition to TRU's claims that Ward's management style was abrasive and unpopular, TRU also claims that there were loss prevention

concerns, scheduling problems, issues with the store's appearance, and problems with customer service.  TRU claims that it is these reasons, not the "Islands of Service" program, that caused the complaints to come in against Ward.

Ward first became aware of these complaints against her when she was called out of a Director's meeting on June 26, 1996 and counseled orally and in writing by Theresa Epperson of Human Resources, Edward Ramm of Loss Prevention, and Craig Fitch, the District Manager.  Ward was told that for the next several months, Assistant Store Director Mitchell was to write employee schedules, handle employee management, and perform the day to day functions of running the store.

### **Allegations of Sexual Harassment**

#### Charles Mitchell

Mitchell commented to Ward the first time he met her that he did not like blonds.  Ward is a blond.  After that time, Mitchell frequently told vulgar jokes in the store, in front of employees, and in staff meetings.  He discussed his relations with his wife, snapped Ward's bra strap, ran a cup of ice down Ward's back, and commented on the tightness of her clothing and the way other women were dressed.  One such comment was that because Ward was wearing a skirt, "it would be so easy."

When Ward was Assistant Store Director at Eastwood, she complained about Mitchell to Bell, the Store Director, on a number·

6

of occasions.  Ward and Bell spoke to Mitchell about his improper behavior several times.  When Ward was Store Director of Eastwood, she complained about Mitchell's harassment to District Manager Fitch and others.  On July 2, 1996, Ward formally counseled Mitchell for his sexual harassment and Federal Expressed a report of this session to Fitch.

### Harassment by individuals other than Mitchell

During a district meeting of upper level management in Pensacola Fitch and other males told bawdy jokes and Fitch described his vasectomy in detail.  Various male managers discussed how female store directors "did not have a clue" and were "in over their heads."

### **Ward's Termination**

On September 6, 1996, Ward was terminated allegedly for taking a \$20 markdown on a store display model baby stroller with a missing part.  Ward took the markdown for an acquaintance. Although Store Directors were given a great deal of discretion with respect to the markdown of merchandise, it was clearly against TRU policy for any employee to give markdowns for friends or family. Ward had been counseled about this policy in the past and was aware of it.

Ward acknowledges that she may have violated the letter of this policy; but she claims that the policy was not applied evenhandedly, that others flaunted it, and that it was a pretext

used by TRU to let her go just two months after she had complained to Fitch about sexual harassment by Charles Mitchell.

On December 11, 1996, Ward filed employment discrimination claims with the EEOC.  Ward filed the present complaint with this court on May 6, 1998.

**DISCUSSION**

**STATUTE OF LIMITATIONS**

**TITLE VII CLAIMS**:

TRU argues that all of Ward's Title VII claims are time barred.  With respect to time limitations, the statute states, in pertinent part:

> (1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . .

42 U.S.C. § 2000e-5(e)(1).

Each of Ward's Title VII claims will be examined in turn for untimely filing.

### Failure to Promote

To demonstrate timely filing of her "failure to promote" claim, Ward must show the existence of at least one promotional opportunity that she was denied within the 180-day period before she filed her EEOC claim on December 11, 1996.  *See Jones v. Firestone Tire and Rubber Co. Inc.*, 977 F.2d 527, 536 (11th Cir. 1992).

8

First, Ward argues that a store directorship was available at an "E" level store in Tuscaloosa within the statutory period, thus meeting the requirement of *Jones*. *Id*. Next, Ward argues that even if the 180-day period had run, this period was tolled because TRU actively misled her with respect to promotional opportunities.

a) Directorship at the "E" level Tuscaloosa store.

With respect to Ward's claim that a promotional opportunity that she was denied existed during the statutory period, the "E" volume Tuscaloosa store will not qualify as she claims. At all relevant times during 180-day statutory period prior to the filing of her EEOC claim, Ward was a store director of a "B" volume store. Thus, a directorship at the smaller, lower-paying "E" volume store in Tuscaloosa would have been a demotion, not a promotion. Therefore, Ward has not identified a "promotional opportunity" available to her during the statutory period, and the 180-day limitation bars her claim in that respect.

b) Tolling of the statute.

One court explained its idea of equitable tolling as follows: "[E]quitable tolling may be appropriate if (1) the  defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." *Freeman v. CSX Transportation Co.*, 730 F.Supp. 1084, 1086-87 (M.D. Ala.1989).

Ward argues that the statute should be tolled because TRU actively misled her about opportunities for promotion. Ward alleges that because TRU does not post its openings, she was not able to know when her rights to promotion were being violated.

Although Ward may have been unaware of promotional opportunities before they were filled, she must nonetheless have become aware of them immediately after they were filled by someone besides herself. At that point Ward had 180 days to file a complaint if she felt that one was called for. This court does not agree with Ward that TRU's failure to disseminate in advance information about promotional opportunities is equivalent to "actively misleading" her, or that it prevented Ward "in some extraordinary way" from asserting her rights. Thus, Ward has not offered an explanation sufficient to invoke equitable tolling.

In her various evidentiary submissions in opposition to TRU's motion for summary judgment, Ward has presented evidence of possible disparate treatment for men and women at TRU which, if believed, may demonstrate that men and women do not have equal opportunities for promotion at TRU. However, because Ward has offered no evidence that she invoked her rights within the statutory period, or that tolling should extend the period, her claims are time-barred.[1]

---

[1]As the U.S. Supreme Court noted in *Evans*: "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the

10

### Discriminatory Pay

As the Eleventh Circuit has made clear, "[w]hen the claim is one for discriminatory wages, the violation exists every single day the employee works." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993). Because Ward was employed with TRU during part of the 180-day statutory period, any discriminatory pay that existed would have occurred within that limitations period. To the extent, if any, that Ward has raised genuine issues of material fact with respect to discriminatory pay, such claim would not be time-barred.

### Sexually Hostile Environment

Ward has alleged a number of acts of sexually hostile environment that fall within the 180-day limitation period. In addition, she argues that a number of the alleged acts occurring prior to the 180-day period should be considered by the court under the "continuing violation" theory.

As the Eleventh Circuit explained:

> The critical distinction in the continuing violation analysis is whether the plaintiff complains of the present consequence of a one time violation, which does not extend the limitations period or the continuation of that violation into the present which does.

*Knight v. Columbus, Ga.*, 19 F.3d 579, 581 (11th Cir.1994).

---

statute was passed . . . it is merely an unfortunate event in history which has no present legal consequences. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558; 97 S.Ct. 1885, 1889 (1977).

11

Here, Ward asserts that she is not pointing to a discrete event that occurred before the 180-day period which is continuing to have negative ramifications into the present. Instead, Ward is complaining of the continuation of a pattern of conduct into the 180-day statutory period.

TRU responds by arguing that the continuing violation theory cannot apply because any alleged violations, if they occurred at all, should have triggered Ward's awareness that her federally protected rights had been violated. If Ward, notwithstanding such awareness of the violation of her rights, failed to exercise those rights under Title VII, then she will be barred from using the continuing violation theory. As one court put it: "A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the ... limitation period." *Dudley v. Metro-Dade County*, 989 F.Supp. 1192, 1199 (S.D. Fla 1997) *quoting Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793, 801 (11th Cir.1988).

In *Dudley*, however, the "occurrence" which the court found should have triggered Dudley's awareness that her rights had been violated, thereby creating in Dudley an obligation to either pursue her Title VII claim or lose it, was that her supervisor "unzipped his pants and exposed himself." *Id*. This court agrees that such an occurrence should make an employee aware that her civil rights had

12

been violated.

Here, in contrast, Ward claims a series of allegedly hostile and harassing acts which, considering the totality of the circumstances, may present a claim for hostile work environment. Although no examination of the merits of Ward's claim has yet occurred, the court finds that the continuing violation theory will allow Ward to include incidents occurring before the 180-day period with her hostile environment claim.[2]

### EQUAL PAY ACT CLAIM

TRU argues that Ward's Equal Pay Act ("EPA") claims are time-barred.  The statute of limitations applicable to the EPA claim states, in pertinent part:

> . . . every such action shall be forever barred unless commenced within two years after the cause of action accrued . . .

29 U.S.C.A. § 255(a).

For the same reasons discussed above with respect to Title VII, any sex-based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act. *Hodgson v. Behrens Drug Company*, 475 F.2d 1041, 1050 (5th Cir. 1973).

---

[2]The court views with some sympathy the difficult position TRU faces when, in order to maintain its argument against the continuing violation theory, TRU takes two seemingly contradictory positions.  On the one hand, in its motion for summary judgment against the substantive allegations, TRU argues that no sexually hostile environment existed at all.  Next, in opposition to Ward's assertion of the continuing violation theory, TRU argues that the violation was so plain that it must have been "clear to her that she had a right to assert a claim under Title VII well before December 11, 1996."

13

Because Ward was employed with TRU during part of the 180-day statutory period, to the extent that TRU's motion seeks dismissal of Ward's EPA-based discriminatory pay claim because it is time-barred, the motion is due to be denied.

## SUBSTANTIVE CLAIMS

### TITLE VII

#### Sexually Hostile Work Environment

Five elements comprise a *prima facie* claim of sexual discrimination based on a hostile work environment: 1) membership in a protected group, 2) unwelcome harassment 3) based on sex, 4) sufficiently severe to alter a term or condition of employment, and 5) respondeat superior. *See Henson v. City of Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982).

TRU apparently does not contest the first two elements, 1) that Ward is a member of a protected class, and 2) that she was subjected to unwanted sexual harassment. But TRU does contest the final three: 3) that the alleged harassment was based on sex, 4) that the alleged conduct was sufficiently severe to alter a term or condition of Ward's employment, and 5) TRU's respondeat superior liability.

The third element imposes a requirement that Ward "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). TRU points to the fact that Ward's own personal

14

definition of harassment based on sex includes merely objectionable conduct not of a sexual nature, and thus her claim should be discounted. TRU may be somewhat off target by focusing on Ward's definition of harassment based on sex. Ward, while perhaps over-inclusive in her definition of sexual harassment, is correct when she asserts that hostility toward women, simply because they are women, even if not explicitly of a sexual nature, does constitute hostile environment sexual harassment. *See Huddleston v. Roger Dean Chevrolet, Inc*., 845 F.2d 900 (11th Cir.1988)(male co-salesperson threatened to deprive plaintiff of customers, and "expelled gas" during her sales presentations); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) ("The offensive conduct is not necessarily required to include sexual overtones in every instance."); *Hall v. Gus Constr. Co*., 842 F.2d 1010, 1014 (8th Cir.1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances."[male construction workers urinated into women's water bottles or automobile gas tanks, and male mechanics refused to repair a carbon monoxide leak until requested to do so by male workers])

Here, Ward alleges a list of occurrences which, if believed, demonstrate hostility toward her because of her gender. These include ongoing sex-related joking, comments about women being "over their heads" in management positions, lack of response from

15

management with respect to her complaints about sexual harassment,
and many other examples of spoken and unspoken exclusion,
isolation, and disrespect. Thus, she meets this element of the
claim

The fourth element imposes a requirement that Ward show that
the harassment was sufficiently severe and pervasive so as to alter
the conditions of employment and create an abusive working
environment. *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993).

The severity and pervasiveness of the alleged harassment has
both an objective and a subjective component: 1) A reasonable
person in the plaintiff's position would find the harassment severe
and pervasive, and 2) this plaintiff must have found it so. *Id.*

With respect to the "subjective" part of this fourth element,
this court finds that a reasonable jury could believe, based on the
record, Ward's assertion that she subjectively experienced
harassment that was severe and pervasive. With respect to the
"objective" part of the test, the question is whether a reasonable
person in Ward's position would have experienced the alleged acts
to have been severe and pervasive harassment. *See Clover v. Total
System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

With respect to the severity of the alleged harassment, Ward
describes one situation, for example, where she was a female store
director in a management meeting where one topic of discussion was
that female managers "do not have a clue" and are "in over their

16

heads." Ward was, at that time, a knowledgeable, mature retail manager with over twenty years experience. This court believes that a reasonable jury could find that such an incident might have been intensely humiliating to a reasonable person in Ward's position; especially when one of those present at that discussion was the District Manager in charge of the dozen stores in Ward's area.

With respect to the pervasiveness of the alleged harassment, assuming the truth of Ward's allegations, this court finds that a reasonable jury could find that Charles Mitchell's ongoing pattern of sexual comments and off-color jokes could constitute a pervasive environment of harassment. This court's conclusion is bolstered by the fact that others besides Ward, making similar allegations about Mitchell's conduct, have submitted affidavits into evidence.

In *Faragher* and *Burlington Industries*, the Supreme Court established that employers are vicariously liable for the actions of their supervisory personnel when the supervisor creates a hostile environment in the workplace. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292-93 (1998); see also *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270 (1998). This standard applies equally to cases where the supervisor had adequate notice of a sexually hostile work environment and did nothing to remedy the problem, thus facilitating and prolonging the harassment. *Coates v. Sundor*

17

*Brands, Inc.*, 164 F.3d 1361, 1368 (11th Cir. 1999).

To establish liability, the Supreme Court differentiated between cases in which an employee suffers an adverse "tangible employment action" as a result of sexual harassment and those cases in which an employee suffers the intangible harm of the indignity and humiliation caused by hostile work environment sexual harassment. In the former case the vicarious liability is established simply by the proof of sexual harassment and the adverse tangible employment action taken by the supervisor. See *Faragher*, 524 U.S. at ---, 118 S.Ct. at 2292-93; *Burlington Industries*, 524 U.S. at ----, 118 S.Ct. at 2270. In the latter case--where no tangible employment action has been taken -- the defending employer may bring forward an affirmative defense to defeat liability. *Id.*

Here, because Ward was terminated, there is no question that a tangible adverse employment action was taken.[3] Thus the Faragher/Burlington affirmative defense will not be available.

To the extent that TRU's motion for summary judgment seeks dismissal of Ward's hostile work environment harassment claim as a matter of law, the motion is due to be denied.

_____

[3] "[A] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" as well as the "denial of a raise or a promotion." *Burlington Industries*, 524 U.S. at ----, 118 S.Ct. at 2268.

**WAGE DISCRIMINATION**

**Title VII**:

Ward has submitted evidence that her starting salary was substantially lower than similarly situated males, and that she was paid the minimum for her position at each level of promotion, while all or virtually all males were paid above the minimum.

TRU does not counter by offering a non-discriminatory explanation for these discrepancies, but instead says that the claims are a) time-barred, or b) inadmissible for Ward's failure to raise them at the administrative level.

Even though the hiring of Ward occurred prior to the 180-day limitations period, all her future pay levels may have been directly based on and dependent on those starting salaries, up to and including her last paycheck. As discussed above, wage discrimination claims are renewed at each paycheck, and are thus not time-barred.

With respect to Ward's alleged failure to raise the issue administratively, in her affidavit in support of her discrimination charge to the EEOC, Ward stated:

Male employees, whether it be directors, assistant directors, or managers would often brag to me about the high salaries they were making. I have seen documents that clearly show that male employees were making higher salaries than other female workers similarly situated.

19

This court is satisfied that wage discrimination claims are not waived for failure to raise them administratively.  Moreover, this court finds that Ward has raised genuine issues of material fact on the question of wage discrimination, and TRU's motion for summary judgment on that issue is due to be denied.

### Equal Pay Act

To establish a *prima facie* case under the Equal Pay Act Ward must show that TRU pays different wages to employees of the opposite sex for equal work within the same establishment.  Once a plaintiff makes out a *prima facie* case, the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act:  "(i) a seniority system;  (ii) a merit system;  (iii) a system which measures earnings by quantity or quality of production;  or (iv) a differential based on any other factor other than sex." *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 196,94 S.Ct. 2223, 2229 (1974)(quoting 29 U.S.C. § 206(d)(1)).

Again, TRU does not offer as an affirmative defense one of the four non-discriminatory exceptions to explain any of Ward's alleged wage discrepancies. Instead TRU argues that Ward cannot make her *prima facie* case because she does not meet the requirement that any alleged unequal pay must be based on a comparison between employees within the "same establishment."

TRU points to *Bartlet* v. *Berlitz Sch. of Languages of*

*America, Inc.*, 698 F.2d 1003 (9th Cir. 1983) for the proposition
that multiple offices are not a "single establishment" unless
unusual circumstances apply. There, the court found that each
Berlitz School was a separate entity that made its own policy,
did its own hiring, etc., and, therefore, wage comparisons among
School directors would be, to paraphrase, like comparing apples
and oranges. TRU argues that the rule in *Berlitz* would preclude
Ward from comparing her salary to Store Directors of other
stores.

     This court is more convinced, however, by the factual
comparison to *E.E.O.C. v. Altmeyer's Home Stores, Inc.*:

> The evidence in this case shows that the defendant was
> active as a single unit, an  incorporated entity; . . .
> and that it maintained storerooms as outlets in places
> where its goods were shipped to each of the stores as
> required;  that it maintained one payroll for all of
> its employees in all of the stores;  that it provided
> one set of rules for the conduct of all the stores as a
> matter of uniform policy; that it also applied the same
> governing rules for pay for the employees of all the
> stores, with the exception of the larger "A" stores
> which were on a different basis . . . Transfers or
> promotions of employees are made between stores and the
> pay of all the employees comes from the main office.
> Accordingly, the defendant's contention that each store
> is a separate establishment falls of its own weight.

*E.E.O.C. v. Altmeyer's Home Stores, Inc.*, 672 F.Supp. 201, 210
(W.D. Penn. 1987).

     Contrary to TRU's assertion, Ward has raised genuine issues
of material fact with respect to whether similarly situated males

were paid higher for the same job. TRU has not explained the discrepancy by offering any one of the four non-discriminatory explanations discussed above. Accordingly, to the extent that TRU's motion seeks dismissal of Ward's Equal Pay Act claim as a matter of law, the motion is due to be denied.

### **RETALIATION**

In order to establish a *prima facie* case of Title VII retaliation, Ward must show (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999) *quoting Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). If TRU offers legitimate reasons for the adverse employment action, Ward then bears the burden of proving, through a preponderance of the evidence, that the reasons offered are pretextual. *Id*. Under Title VII, Ward need not prove the underlying claim of discrimination in order to establish a retaliation claim. *Id*. at 869.

(1) <u>Statutorily Protected Expression</u>

Section 704(a) of Title VII prohibits retaliation against those who have "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . ."

Ward meets element number one because, in making her

22

complaint to Fitch about alleged sexual harassment by Charles Mitchell, Ward made a charge and thereby participated in an internal proceeding with respect to alleged harassment.

(2) Adverse Employment Action

Ward meets this element because termination is as an adverse employment action.

(3) Causal Link Between the Protected Expression and the Adverse Action.

In order to establish the requisite "causal link" of her *prima facie* case, Ward need only establish that "the protected activity and the adverse action were not wholly unrelated." *Goldsmith*, 996 F.2d at 1163. At a minimum, Ward must establish that TRU was actually aware of the protected expression at the time it took adverse employment action. *Id*.

There is no question here that Fitch was aware of Ward's complaints about Mitchell's harassment because Ward made the complaints directly to Fitch. TRU also acknowledges that Fitch was consulted about the termination before it was effected, and that he concurred in the decision and recommended termination.

TRU argues, however, that Fitch was in no way connected to the decision-making process that resulted in Ward's termination, and that those who did make the decision were entirely unaware of Ward's sexual harassment complaints. TRU maintains that "intellectual dishonesty," based on an improper markdown of

23

merchandise, was the legitimate, non-discriminatory reason for Ward's termination.

Ward argues that this reason is a pretext. She points to the deposition testimony of Mark Sappington in the related case of *Tolbert v. Toys "R" Us*. Sappington, the Loss Prevention Specialist responsible for investigating the stroller markdown incident that led to Ward's termination, was asked during his deposition in *Tolbert* whether Ward was terminated for a loss prevention issue. Sappington stated in response: "I don't think so. I think it was more of a . . . . I'm not exactly sure what the term was, but I know it was a conflict between her and the District Manager." Again, Sappington was the very Loss Prevention Specialist responsible for the investigation into the stroller incident that led to Ward's termination.

Taking all inferences in favor of Ward, as the court must, this court finds that if Ward's evidence is credited by the jury, that a reasonable jury could believe that a District Manager of twelve stores, consulted in advance, would have had significant input into the decision to fire one of his Store Directors; especially when that Store Director, an employee with six years experience with the company, was being terminated over the $20.00 markdown of a floor display model baby stroller with a missing part. Because a reasonable jury could believe that Fitch participated significantly in Ward's termination, just two months

24

after she complained to him about sexual harassment by Mitchell,

there remain genuine issues of material fact with respect to

retaliatory motive for the termination.  Accordingly, to the

extent TRU's motion for summary judgment seeks the dismissal of

Ward's retaliation claim as a matter of law, the motion is due to

be denied.

## STATE LAW CLAIMS

### NEGLIGENT HIRING, SUPERVISION AND RETENTION[4]

Both parties in this matter agree that Ward's supplementary

state law claim for negligent supervision and retention can only

succeed if TRU had notice of the actions of the allegedly

---

[4]"In the master and servant relationship, the master is held
responsible for his servant's incompetency when notice or
knowledge, either actual or presumed, of such unfitness has been
brought to him.  Liability depends upon its being established by
affirmative proof that such incompetency was actually known by
the master or that, had he exercised due and proper diligence, he
would have learned that which would charge him in the law with
such knowledge.  It is incumbent on the party charging negligence
to show it by proper evidence.  This may be done by showing
specific acts of incompetency and bringing them home to the
knowledge of the master, or by showing them to be of such nature,
character, and frequency that the master, in the exercise of due
care, must  have had them brought to his notice.  While such
specific acts of alleged incompetency cannot be shown to prove
that the servant was negligent in doing or omitting to do the act
complained of, it is proper, when repeated acts of carelessness
and incompetency of a certain character are shown on the part of
the servant to leave it to the jury whether they would have come
to his knowledge, had he exercised ordinary care." *Lane v.
Central Bank of Alabama, N.A.* 425 So.2d 1098, 1100 (1983);
*quoting Thompson v. Havard,* 285 Ala. 718, 235 So.2d 853 (1970).

25

offending employee. That is, that TRU knew or should have known that Ward was being sexually harassed. As stated in *Brown v. Vanity Fair Mills, Inc.*, 291 Ala. 80, 277 So. 2d 893, 895 (1973) "[A]n employer ... must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature . . ." The parties in the present matter do not agree, however, as to whether TRU received such notice.

### Charles Mitchell

Ward states that during the time she was working as Assistant Store Director under the supervision of Store Director Doug Bell ("Bell") that she spoke to Bell on several occasions about sexual harassment by Mitchell, making known her view that Mitchell needed to be formally written up. Ward states further that Bell reacted by saying that Mitchell was simply "misunder-stood," and that Mitchell was just trying to be humorous and was taken the wrong way.

Ward further maintains that once she became a Store Director supervising Mitchell, that she complained to Fitch about Mitchell's alleged harassment. Fitch told Ward to handle the situation herself by counseling Mitchell outside the store, being careful not to threaten or upset Mitchell. Ward met with Mitchell outside the store as directed, documented this conversation, and Federal Expressed the report to Fitch.

Ward also states that she is personally aware of other employees who complained about Mitchell's harassment to the company management and Human Resources Department.

Thus, because Ward has introduced evidence sufficient to raise genuine issues of material fact with respect to TRU's notice of Mitchell's harassment, she survives summary judgment on her claim that TRU breached its duty to her by retaining an employee that TRU knew was "unworthy by habits, temperament, or nature."

Craig Fitch

Ward maintains that because TRU knew that Craig Fitch was an announcer at a topless bar prior to his tenure at TRU, that TRU owed a duty to provide him specific gender harassment training and close supervision. Ward claims that TRU's failure to do so proximately caused her loss of career opportunity.

This court is unable to find that every man who was once an announcer at a topless bar is morally suspect as a matter of law, and this court is consequently unable to find that TRU was negligent per se for failing to provide Fitch with specialized training.

This court finds that Ward has raised genuine issues of material fact with respect to whether TRU was on notice of Mitchell's allegedly harassing behavior, yet failed adequately to remedy the situation. Thus, to the extent that TRU's motion

27

seeks dismissal of Ward's negligent retention claims as a matter of law relating to Charles Mitchell, the motion is due to be denied.

### DAMAGES

TRU asks this court to make a determination in advance with respect to the type of damages that might be available to Ward should she prevail on the merits.  Such a determination would be premature.

An appropriate order DENYING in part and GRANTING in part TRU's motion for summary judgment will be entered.

DONE this _7th_ day of September, 1999.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

28